**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

J. STEPHEN POHL, ROBERT B. SCHULTZ )
AND STEPHEN L. WEBSTER, AS TRUSTEES )
OF THE DS&P INSURANCE SERVICES, INC. )
401(K) PROFIT SHARING PLAN, )
)
      Plaintiffs, )
)
) No. 04 C 6223
      v. )
) Judge John A. Nordberg
JOHN McCAFFREY, )
)
      Defendant. )

## MEMORANDUM OPINION AND ORDER

The case was filed by the Trustees of a 401(k) plan to recover shares of stock that were mistakenly distributed to an employee after he left the company. The Plan seeks to recover these shares under ERISA based on a theory of restitution. Before the Court is the Plan's motion for summary judgment.

## FACTUAL BACKGROUND

Defendant John McCaffrey was an employee of DS&P Insurance Services, Inc. ("DS&P"). At some point, DS&P created a 401(k) plan known as The DS&P Insurance Services, Inc. 401(k) Profit Sharing Plan. Plaintiffs are Trustees of the Plan. McCaffrey was a participant in this Plan while he worked at DS&P.

The Plan owned shares of several other corporations, one of which was American Chartered Bancorp ("ACB"). Although we have not been given copies of the Plan documents,

the parties represent that the Plan provided that each participant owned a *pro rata* interest in the shares of ACB and the other corporations.  This apparently meant that each participant owned a specific percentage of the ACB shares owned by the Plan.  Although the parties have not told us what McCaffrey's percentage was, they appear to agree that his percentage interest was such that his interest at all times was 1773.56 shares.

But McCaffrey was never told what his percentage allocation was or that it consisted of 1773.56 shares.  This is because the Plan only told participants, in an annual statement sent to them in August of each year, what the *dollar value* of their interest was.  Each annual statement contained three figures regarding ACB shares:  an opening balance; an amount labeled variously as "Earnings," "Earnings/Depreciation," or "Gains(Losses)"; and a total ending balance, which consisted of the opening balance plus earnings.  All three figures were stated only in dollar amounts with no indication of how these figures were determined.  For example, McCaffrey's August 31, 1995 statement, which is the earliest one we have, simply stated that he had an opening balance in ACB stock of $20,235.84; that he had "Earnings" of $2,447.46, and that he had a closing balance of $22,683.30.

The annual statements were prepared by the Plan's actuary, the Emering Companies, LLC.  In preparing these annual statements, the actuary had to calculate these three dollar amounts for each participant.  It did so by multiplying the total number of shares and then allocating that dollar value *pro rata* among the Plan participants.  The actuary presumably had a list of the *pro rata* amounts.  There was a further wrinkle in this process.  Because ACB was not a publicly traded company with an easily ascertainable share price, the actuary had to get the

most recent share price from ACB, which periodically calculated this price. In sum, the annual statement was prepared by the actuary who had to get information from both the Plan and ACB.

It was a breakdown in communication among these three parties that led to the two key mistakes in this case. The first mistake was an under distribution of shares to McCaffrey. This mistake arose when the actuary, in preparing the 1998 annual statements, failed to use the most recent share price. This is because, for some reason, the actuary was unaware that the ACB had began calculating its share price on a quarterly basis. Up until 1998, ACB had determined its share price annually, at calendar year end. So the actuary prepared the 1998 statement based on the December 31, 1997 share price, which was $34 per share, instead of using the most recently determined quarterly share price, which was $38 a share. At this point, no one was aware of the mistake, and in fact, as long as McCaffrey was still a participant in the Plan, this mistake would have had little consequence as it naturally would have been corrected in later statements when the then current price was used.

This initial mistake became more significant when McCaffrey stopped working for the company effective November 30, 1998, at which time he asked that the Plan distribute his ACB shares to his Individual Retirement Account. (At this point, McCaffrey still had no basis for knowing how many shares he should receive.) After receiving McCaffrey's request, the Plan administrator, who at the time was Rudy Drost, bypassed the actuary and sent a letter directly to ACB asking it to transfer to McCaffrey's IRA the "corresponding number of shares" that were "represented by" the dollar balance on his 1998 statement. Because ACB apparently did not have a list of the *pro rata* interests of each participant, it determined the number of McCaffrey's shares by, in effect, "re-translating" the dollar balance back into a share amount. In doing so,

ACB wrongly assumed that the actuary had previously calculated this dollar balance by using the most recent quarterly price of $38. The actuary thus divided McCaffrey's ending balance of $60,301 balance by $38 rather than $34 as the actuary had done, and determined that McCaffrey should receive 1587 shares. As everyone now agrees, this was an under distribution and the correct amount of shares should have been 1773.56. Because McCaffrey did not know how many shares he should have received nor was he able to look up the share price of ACB, he had no way of knowing that he was owed an additional 186.69 shares.

This mistake went undetected for approximately a year. It was eventually discovered by the actuary the following August when it began preparing the 1999 statement and discovered that McCaffrey was owed an additional 186.69 shares.[1] For some reason, the actuary did not take any affirmative steps to see that these additional shares were then distributed to McCaffrey but instead sent him an annual statement that was intended to show that the Plan was still holding 186.69 shares that were allocated to him. Not only was this an awkward and indirect *way* to let him know that there had been a mistaken under distribution, but the statement *itself* was as everyone now agrees confusing.

The relevant portion of the statement was the following:

| | |
|---|---|
| American Chartered Bank 9/01/98: | $60,301.19 (1,773.56 shares) |
| Earnings: | $8,681.09 |
| Distributions: | (60,301.19) |
| American Chartered Bank 8/31/99 | 8,681.09 (186.69 shares) |

---

[1]One important fact to keep in mind is that Emering, according to his affidavit, believed *at this time* that McCaffrey was *only* owed an additional 186.69 shares and that he thus never believed that McCaffrey was owed 373.25 shares. *See* Affidavit of Edward Emering at ¶¶ 10-12.

McCaffrey argues that these four lines are ambiguous because they show "the value of" the 186.69 shares twice – directly in line 4 and indirectly in line 2. McCaffrey apparently came to believe (the reasonableness of this belief will be examined further below) that the statement indicated that he was owed two sets of 186.69 shares, or 373.25 shares overall. One set of 186.69 shares was indirectly represented by the $8,681.09 earnings figure in line 2 and the other set of 186.69 shares was referred to directly in line 4.[2]

On April 20, 2000, which was approximately 6 months after he received the 1999 statement, McCaffrey sent an email to Nancy Zorica at DS&P requesting 373.25 shares. We do not know what position Zorica held with the company nor why McCaffrey directed his request to her. Nevertheless, this email stated:

> Per our conversation I should have 1,960.25 shares of American Chartered Bank stock per Ed Emering. Rudy only transfered 1587 shares. Please direct a letter to Bill Grant at the bank to transfer an additional 373.25 shares to . . . .[3]

(Cmplt. Ex. D.)

A few months later, in July 2000, Stephen Pohl, who had replaced Drost as the plan administrator, responded to this request by instructing ACB to transfer 373.25 additional shares to McCaffrey's IRA. Pohl states that he was unaware that this was twice the amount McCaffrey should have received.[4]

---

[2] The $8,681.09 figure was derived by multiplying the 186.69 shares by the then current share price of $46.50.

[3] The email then listed the address and account number of his IRA account.

[4] There is a dispute about whether Pohl contacted the actuary at this time to verify that McCaffrey was owed 373.25 shares. McCaffrey says that Pohl did, but the Plan denies this fact. McCaffrey's contention is based on a letter written by Pohl three years later. *See* Ex. 7 (2/27/03 Letter). In this letter, Pohl recounted that he directed the bank to issue the shares after his office "verif[ied] this with [Emering's] office." As we discuss below, it is likely that Pohl's

In the fall of 2000, the Plan's actuary discovered this mistake when it was preparing the August 2000 annual statements. Sometime later in the fall of 2000, the actuary informed Pohl of the mistake. (Pohl Aff. ¶ 31.)

Although Pohl knew about the mistake in the fall of 2000, he failed bring this fact to McCaffrey's attention until July 16, 2002 when Zorica informed McCaffrey that he had been overpaid by 186.69 shares and that the Plan needed them back. (Group Ex. 6.) Plaintiffs fail to offer any explanation for why the Plan took approximately 20 months to begin the process of rectifying this mistake.

The Plan's initial tardiness in requesting the return of the shares was then matched by McCaffrey's prolonged delay in responding to that request. After making the initial request for the shares in July 2002, the Plan repeatedly contacted McCaffrey in an attempt to get him to return the shares or to at least indicate what his position was, but he kept refusing to give an answer. The Plan later had its attorneys write a letter, and eventually McCaffrey's attorneys responded. After a failed attempt to settle the case, the Plan filed this lawsuit, initially in state court on March 2, 2004. Plaintiffs then voluntarily dismissed that action because the federal court had exclusive jurisdiction over their claim and filed this action here. In total, this process of attempting to resolve this matter outside of court took almost 20 months, with most of the delay being caused by McCaffrey's refusal to respond to the Plan's inquiries.

---

recollections are inaccurate because Emering has asserted in his affidavit that he never believed that McCaffrey should have received 373.25 shares.

**DISCUSSION**

This claim is brought pursuant to 29 U.S.C. § 1132(a)(3)(B), which states in relevant part that a civil action may be brought by, among others, a fiduciary to obtain "appropriate equitable relief." The Seventh Circuit has held that a plan's claim for a mistaken overpayment may be brought pursuant to this ERISA section. *See Central States, Southeast and Southwest Areas Health and Welfare Fund v. Neurobehavioral Assocs.*, 53 F.3d 172, 173 (7th Cir. 1995) (due to a clerical error, the plan mistakenly paid a medical provider $10,000 instead of $100).

McCaffrey makes two arguments. First, he argues that the claim is barred by the statute of limitations. Second, he argues that the equities are such that he should be allowed to retain this shares even though everyone agrees that he was given them by mistake. We are not persuaded by either argument.

**I.     Statute of Limitations.**

McCaffrey argues that plaintiffs' claim is barred by the three-year statute of limitations set forth in ERISA § 1113, which pertains to an action relating to a fiduciary's breach of any duties, because the claim was filed more than three years after Pohl learned of the mistake. In support of this argument, McCaffrey relies on two case – *Smith v. Eaton Corp.*, 102 F.Supp.2d 439 (W.D. Mich. 2000) and *Yablon v. Stroock & Stroock & Lavan Retirement Plan & Trust*, 2002 WL 1300256 (S.D.N.Y. June 11, 2002).

Plaintiffs argue that they are not bringing a claim under § 1113, which is set forth in Part 4 of ERISA, but are instead bringing a claim for "appropriate equitable relief" under § 1132(a)(3), which is set forth in Part 5 of ERISA. Plaintiffs further argue that the limitations period of Part 4 does not apply to claims under Part V and that the limitations period for those

claims should be taken from the analogous state statute of limitations period, which they assert is the five-year period found in 735 ILCS 5/13-205, which governs all civil actions not otherwise provided for. Plaintiffs cite a number of cases in support of their argument. *See, e.g., Nolan v. Aetna Life Ins. Co.*, 588 F.Supp. 1375, 1378 (E.D. Mich. 1984) (holding that the 3-year limitations period in Part 4 does not apply to a claim under ERISA Part V and that the analogous state limitations period should be used); *Wright v. Southwestern Bell Telephone Co.*, 925 F.2d 1288, 1290 (10th Cir. 1991) ("We hold the district court erred when it concluded that section 1113 was applicable to an action brought under section 1132. Section 1113 is, in fact, only applicable to actions arising out of violations of the portion of the Act addressing fiduciary responsibilities[.]"); *Campanella v. Mason Tenders' District Council Pension Plan*, 299 F.Supp.2d 274, 280 (S.D.N.Y. 2004) (same); *see also Kwak v. Joyce*, 683 F.Supp. 1546, 1548 (N.D. Ill. 1988) (noting that ERISA claims under § 1132 are not governed by the statute of limitations in Part 4).

After reviewing these arguments, we are persuaded by plaintiffs' argument and cases. As plaintiffs note, the Seventh Circuit has indicated that a claim for restitution may be brought under § 1132. *See Central States, Southeast and Southwest Areas Health and Welfare Fund v. Neurobehavioral Associates, P.A.*, 53 F.3d 172 (7th Cir. 1995). Moreover, in several of the cases cited by McCaffrey in support of his argument on the issue of restitution, the parties also brought their claims under this same section. *See, e.g., Phillips v. Maritime Assoc.-I.L.A. Local Pension Plan*, 194 F.Supp.2d 549, 554 (E.D. Tex. 2001).[5]

---

[5] This result – finding that this claim is not barred by the statute of limitations – makes sense from an equitable standpoint because a significant amount of time was taken up by defendant's unexplained delay in responding to plaintiffs' request to voluntarily return the shares

## II.     Restitution.

Both sides agree on the legal framework. Specifically, they agree that the issue here – whether the Plan should recover the shares under a theory of restitution -- should be analyzed by balancing all the equitable factors in light of the specific factual circumstances of this case. *See generally, Luby v. Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1186 (3d Cir. 1991) ("General equitable principles govern [] federal common-law actions for restitution."); *Phillips*, 194 F.Supp.2d at 555 ("When applying an equitable doctrine for purposes of recoupment, it is critical to consider the circumstances surrounding the overpayment."). They further agree that there is no mechanical test that can be applied and that this Court has wide discretion in considering this question.

Although courts and commentators have provided various formulations for determining whether restitution is appropriate, these formulations are similar and typically rely on a few "dominant themes." *Central States, Southeast and Southwest Areas Health and Welfare Fund v. Pathology Laboratories of Arkansas*, 71 F.3d 1251, 1254 (7th Cir. 1995). Two themes that are particularly prominent in the case law are the relative fault of the parties and the harm or prejudice to the recipient. The parties' arguments in this case are largely structured around these two themes, and we will therefore also focus our analysis upon them.

---

– a request that was meant to avoid the time and expense of litigation. *See Williams v. Sims*, 390 F.3d 958, 959-60 (7th Cir. 2004) (noting generally that a "standard example" of a situation where a statute of limitations may be tolled is "where the defendant requested the plaintiff to delay suit while the parties tried to negotiate a settlement").

### A. Fault.

We first assess the relative fault of the parties. One preliminary point. Courts have uniformly held that a party seeking to recover mistakenly paid funds may still recover even if it is at fault to some degree. *See Luby*, 944 F.2d at 1186 ("under the federal common law of unjust enrichment, restitution of a mistaken payment is permitted even if payment was caused by the negligence of the party seeking restitution"); *Metropolitan Life Ins. Co. v. Solomon*, 996 F.Supp. 1473, 1475 (M.D. Fla. 1998) (granting summary judgment to insurer based on unjust enrichment theory under ERISA even though insurer made a "clerical mistake" in sending out the $61,796 check to defendant). Judge Posner has given a good explanation for the reason for this rule:

> The defendants argue that it was a careless mistake and therefore restitution should be denied. There is no "therefore." Probably the mistake *was* careless; but the law does not permit a person to keep money that he has received by mistake, just because the mistake is careless. Such a rule would make people too careful, penalizing them for mistakes that caused nobody any harm and so should not be penalized at all - the defendants do not argue that having to return their windfall will cause them harm beyond the natural disappointment that one is bound to feel at having to cough up money to someone else, for whatever reason. The law is not finders keepers, unless the property found has been deliberately abandoned, which is to say deliberately relinquished, not merely lost or misplaced. It would be absurd to suppose that if Wausau owed the defendants $1 and by the careless mistake of one of its clerks issued them a check for $1 million, they could keep the $1 million because the mistake was a careless one.

*Employers Ins. of Wasau v. Titan Int'l, Inc.*, 400 F.3d 486, 491 (7th Cir. 2005) (case citations omitted).

This point is important because it cannot be disputed that the Plan itself was at fault for several of these mistakes. In general, the Plan could have done a better job of communicating with the actuary and ACB; the annual statements sent out by the actuary were not as clear as they could be; participants were not made aware of the precise nature of their holdings, and so forth.

On several occasions, the Plan administrators (both Drost and Pohl) should have been more careful in verifying facts before taking actions. This lack of clear communication channels resulted in the original mistaken under distribution of shares. But these mistakes were inadvertent and not intentional. There is no evidence that the Plan was trying to take advantage of anyone. In fact, the Plan and its actuary discovered the original mistake on their own. The Plan administrator then made the second mistake in defendant's favor.

The more disputed question is whether McCaffrey was partially responsible as well. He says no and asserts that all the mistakes in this case were "solely" the fault of the Plan and that he had no involvement in them. (Resp. Br. at 8.) While this latter point is true with regard to some of the mistakes, it is not true with regard to most important one – the mistaken distribution of the 373.25 shares. McCaffrey significantly contributed to this mistake when he affirmatively and unequivocally told Zorica to transfer this specific amount of shares. This request was apparently based on the August 1999 annual statement, a statement that at best was ambiguous and needed further clarification.

To explain this point, we need to carefully review the key facts. The actuary, Edward Emering, states in his affidavit that in preparing the 1999 statements he determined that a mistake had been made and that McCaffrey had only been given 1587 shares and that he thus owned 186.69 shares. The actuary then sent out the 1999 statement that was supposed to communicate this fact. After receiving this statement, McCaffrey concluded that he was owed an additional 373.25 shares. We know this because, in April 2000, he asked Zorica to transfer this amount of shares to his IRA. This was the first time, insofar as we know, that anyone on either side had concluded that he should receive this specific amount of shares. This raises a

critical question: why did McCaffrey request this particular amount and why did he do so in such an assertive manner that expressed no doubt that he was owed that amount of shares? After all, he has made a point of saying that he never knew how many shares were allocated to him because the annual statements merely listed dollar amounts. This question is important to the issue of fault because McCaffrey's request was the initial trigger for the mistake.

Although McCaffrey never provides an explicit answer in his response brief, he suggests that he came to the belief that he should receive 373.25 shares after reading the 1999 statement. *See* Resp. at 3 ("As a result of the confusion generated by the Plaintiffs' August 31, 1999 statement, McCaffrey asked the Plan to transfer an additional 373.25 shares of ACB stock to his IRA account."). The other possibility, not mentioned in his brief, is that he came to this belief after either he (or possibly Zorica) talked to Emering, the actuary. This possibility is based on the fact that McCaffrey stated in the April 2000 email that he believed he was owed these shares "per Ed Emering," thus suggesting that Emering had confirmed this point.

After carefully examining the facts, we find that McCaffrey was partially at fault for this mistake when he made the initial request for 373.25 shares. Up until that point, no one had told him directly that he was owed that many shares. The 1998 statement was – as McCaffrey himself concedes – confusing. A confusing statement by definition is one that raises questions and doubts and one upon which a person should only rely cautiously.

Moreover, after reading the 1999 statement as a whole, we find that McCaffrey at a minimum should have at least had some doubt as to whether his interpretation was correct. His interpretation that lines 2 and 4, both of which referred to $8,681.09, represented two *separate* sets of 186.69 shares raises questions. For one thing, this would be an awkward way to convey

that McCaffrey was owed 373.25 shares. Why split the amounts, listing half in line 2 and half in line 4? And also why put the share amount in parenthesis next to line 4 but not next to line 2? McCaffrey suggests that the "earnings" line could have represented reinvested dividends. *See* Resp. at 2. While this possibility perhaps could explain why there were two separate entries, it still does not explain why lines 2 and 4 both contain a dollar figure that is *exactly the same*. It seems highly implausible that the shares from reinvested dividends would coincidentally be exactly the same amount as the shares already in the account. In general, the fact that lines 2 and 4 list the same dollar figure down to the last penny should have made McCaffrey question whether the two entries were referring to the same amount.

Another indicator from the face of this statement that McCaffrey did not own 373.25 shares is the total dollar balance at the bottom of the statement. This balance is $222,145.21 and consists of the combined value of McCaffrey's interest in ACB shares and his interest in the shares of another company (Great West). The Great West balance was $213,464.12. Subtracting this amount from the total balance leaves $8,681.09 attributable to the ACB shares. If McCaffrey's interpretation were correct, this amount should have been twice that much or $17,362.18.

Despite these warning signs indicating that the statement at a minimum was unclear, McCaffrey's email to Zorica expressed no doubts, contained no hint that his right to the 373.25 shares might be subject to some dispute and ought to be looked at more closely. The email does contain a reference suggesting that Emering might have been the one who came up with the figure. But this possibility seems highly unlikely because we know from the affidavit Emering submitted in this case that he believed at this time that McCaffrey was only owed 186.69 shares,

a fact that Emering would have figured out quickly if he in fact had checked into the matter. *See* Emering Aff. ¶¶ 11-12. So it would be hard to believe that Emering would have told McCaffrey that he was owed 373.25 shares. In any event, the key point is not that McCaffrey had no basis for believing that he was owed these shares but that there were a number of unresolved questions.

To summarize then, the mistaken over distribution of shares was not completely the fault of the Plan as McCaffrey also played some role by aggressively interpreting an ambiguous document in his favor and then by assertively requesting that Zorica transfer the 373.25 shares without expressing any qualifications or doubts. If McCaffrey had instead contacted the Plan and raised questions, asking for example why the $8,681.09 figure was listed twice, then we think that the parties would have been much more likely to figure out the error just as the actuary on its own had done previously.

### B. Harm Or Prejudice.

The second factor is whether McCaffrey was harmed by the mistake. The Restatement of Restitution refers to this issue in terms of whether there has been a change of circumstances. *See* Rest. Restitution ¶ 142. Related to this issue is another factor, which is whether the party seeking recovery acted promptly upon learning of the mistake. We consider this factor along with the prejudice inquiry because the two are related. The longer it takes the recovering party to act the greater chance there is that the recipient will have changed his or her circumstances. *See, e.g., Kraft Foods, Inc. Supplemental Benefits Plan I v. Woods*, 1999 WL 1069247, *5 (N.D. Ill. Nov. 19, 1999) ("since plaintiffs did not unnecessarily delay, the court finds that there could be no prejudice to [the recipient]"). Similarly, the prejudice inquiry is indirectly correlated with

the fault inquiry in that courts are less likely to find prejudice if the recipient had some indication that the money was mistakenly paid to him. *Id.* (finding that recipient was not prejudiced because, among other things, he "knew or should have known that an overpayment occurred").

Looking first at the issue of how promptly the Plan acted to correct this mistake, we find that the Plan clearly was not diligent as it could have been. The Plan waited 20 months to inform McCaffrey of the mistake. The Plan offers no explanation for this delay, and we must therefore presume that there is no good explanation. This delay is thus a factor favoring defendant's position.

Nevertheless, despite this delay, we find that McCaffrey was not prejudiced by this mistaken distribution and did not change his position in any significant way. As noted in Section II.A above, McCaffrey had to have some doubts about his claim to these shares given all the uncertainty and confusion arising out of the 1999 statement. Moreover, he was aware at this time that the Plan had previously made a mistake in distributing too few shares. While McCaffrey believes that this first mistake helps his position by showing that the Plan was in general careless, this earlier mistake actually weakens his argument. If he knew that the Plan previously made a mistake, he would have been on alert to the possibility that the Plan could make yet another mistake. This prior mistake, when combined with the ambiguity of the 1999 statement, should have made him pause. Based on all these uncertainties, we find that he had to have had some inkling of a possible error.

Moreover, McCaffrey has not shown any concrete harm. His only claim of harm is a single statement in his response brief (not corroborated by any affidavit) that "he planned his future savings as if this ACB stock were rightfully his." (Resp. at 9.) But he has failed to point

to any specific way in which he changed his plans. The 186.69 shares are a small amount in comparison to the 1587 shares he already owned. Moreover, these shares were kept in his IRA (he was born in 1950) and have been sitting there this whole time. These shares also are not publicly traded, making it unclear how easily McCaffrey could sell them even if they had not been tied up in his IRA.

This case thus differs from those in which recipients of overpayment changed their position in a significant and concrete way. For example, in *Phillips*, a case McCaffrey cites in his brief, the recipients were divorced older women who had finalized their divorces based on incorrect representations by their ex-husbands' retirement plan. 194 F.Supp.2d at 552. Likewise in *Dandurand v. UNUM Life Ins. Co. of Am.*, 150 F.Supp.2d 178 (D. Maine 2001), another case cited by McCaffrey, the court emphasized that the recipient spent the monthly payments on living expenses over a four-year period and thus had no money on hand to return. *Id.* at 187; *see also Burger v. Life Ins. Co. Of N. Am.*, 103 F.Supp.2d 1344, 1347 (N.D. Ga. 2000) (recipient relied on the incorrect monthly payments in deciding to buy a house with double the mortgage of his current house and in deciding to buy a new car).

Based on these two points – that McCaffrey contributed somewhat to the mistake and that he has not shown any concrete harm beyond the "the natural disappointment that one is bound to feel at having to cough up money" *Employers Ins. of Wasau*, 400 F.3d at 491 – we conclude that the equities are such that these shares should be returned to the Plan. This result, other things being equal, is the preferred one given that these shares belong to the Plan as a whole, which includes participants who had no involvement in the mistakes that led to this error. *See Kraft Foods*, 1999 WL 1069247, at *5 ("if the [recipients] were permitted to retain the

overpayment they would be unjustly enriched at the possible expense of other pension plan beneficiaries"); *see also* Rest. Restitution § 1 ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other.").

## III. Fees.

The remaining question is whether to award fees to the Plan. Under ERISA, this court has the discretion to award reasonable attorneys' fees and costs to either party. 29 U.S.C. § 1332(g)(1). The Seventh Circuit has set forth two tests for whether fees should be awarded. *See Herman v. Central States, Southeast and Southwest Areas Pension Fund*, 423 F.3d 684, 695-96 (7th Cir. 2005) (summarizing law and describing these two tests). However, both tests ask the same general question – namely, "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Id*. at 696 (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998)).

We find that, under either test, fees should not be awarded in this case. Although McCaffrey played some role in the key mistake in this case, it still remains true that the Plan itself also contributed to this mistake and could have prevented it at several points. Furthermore, the Plan complicated what would have otherwise been a relatively clear-cut case by waiting for 20 months before addressing this matter. *See, e.g., Metropolitan Life*, 996 F.Supp. at 1477-78 (ordering restitution but at the same time denying insurer's request for fees because, among other things, the insurer's "clerical error caused the check which started the controversy to be issued"). Given that there are cases finding that restitution should not be awarded when there is a delay in seeking recovery, McCaffrey had at least some justification for his position. Further, because the circumstances of this case are unique and the defendant is an individual, there is less of a

-17-

need for deterrence through an award of fees. After balancing all of these factors, we find that fees should not be awarded.

## **CONCLUSION**

For the reasons set forth above, plaintiffs' motion for summary judgment is granted and the defendant is ordered to return the disputed shares to the Plan. Plaintiffs' motion for attorneys' fees and costs is denied. This concludes this lawsuit.

**ENTER:**

**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** January 25, 2006